1:25-mj-00083AEM

AFFIDAVIT OF TASK FORCE OFFICER JARED JOHANSEN IN SUPPORT OF

<u>A CRIMINAL COMPLAINT AND ARREST WARRANT</u>

I, Jared Johansen, Task Force Officer with the Department of Homeland Security, Homeland Security Investigations ("HSI"), having been duly sworn, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Task Force Officer with the Department of Homeland Security, Homeland Security Investigations and have been since September of 2024. I have been a police officer within the City of Newport Police Department since January of 2014. I have served in the rank of Detective since February of 2021. In September of 2024, I was assigned to Homeland Security Investigations and was designated as a Title 19 Task Force Officer. I am currently assigned to conduct investigations in the HSI Providence Office. In accordance with 19 U.S.C. § 1589a, Task Force Officers are federal law enforcement officers and are authorized to enforce the full range of federal law including violations of other titles of the United States Code, including but not limited to Title 18 and Title 31. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C). I am also an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code, in that I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 21 of the United States Code.

2. In connection with my official duties, I have investigated and assisted

1

other agents in investigating numerous cases involving a wide variety of criminal violations including, but not limited to bank fraud, wire fraud, money laundering, fraudulent check schemes, organized retail crime, and crimes involving the U.S. Mail.

3.  The information contained in this affidavit is based on witness interviews, conversations with investigators from multiple agencies/departments involved in this investigation, my personal knowledge, and observations during the course of this investigation, my personal training and experience as a criminal investigator, and the review of records, documents and other evidence obtained during this investigation. Because this affidavit is submitted for the limited purpose of establishing probable cause for the requested arrest warrants, I have not included each and every fact known to me concerning this investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause to support the complaints and warrants requested herein.

4.  HSI is currently investigating Samyag Uday DOSHI (YOB 2000), Ka Hin LAM (YOB 2005) and other known and unknown individuals for violations of federal statutes, including Conspiracy to Commit Wire Fraud in violation of 18 U.S.C. § 1349 and Wire Fraud in violation of 18 U.S.C. 1343, (together the "Specified Offenses").

## PURPOSE OF AFFIDAVIT

5.  I submit this affidavit in support of applications for criminal complaints and arrest warrants for the following Subjects:

a. Samyag Uday DOSHI (YOB 2000):



3

b.    Ka Hin LAM (YOB 2005)



6.    Based on the facts set forth in this affidavit, there is probable cause to believe that DOSHI, LAM, and other known and unknown individuals did commit violations of Conspiracy to Commit Wire Fraud in violation of 18 U.S.C. § 1349 and Wire Fraud in violation of 18 U.S.C. 1343, (together the "Specified Offenses").

## Probable Cause

### Background

7.    In November 2025, the Newport, RI Police Department received a call for service regarding an elderly Newport resident who may be the victim of an elder abuse financial fraud scam. An investigation began, and Victim #1 was contacted and interviewed. Initially, Victim #1 was not forthcoming with the Newport Police Officers.

4

It was later discovered that he was instructed to do so by the scammer he had been in contact with over the phone. After further investigation by and discussions with Law Enforcement to Victim #1 recognized he was the victim of a scam, and the gravity of the events were learned.

8. Law Enforcement learned that on October 27, 2025, Victim #1 received a voicemail on his cellular phone from -XXX-XXX-4844. The voicemail stated, "For PlayStation 5 and an Impulse 3D headset in the amount of $919.45 with place using your name and phone number. If you did not authorize this purchase, please call our Walmart support immediately at XXX-XXX-3396. Again, that number is XXX-XXX-3396. Please call before the order is dispatched. Thank you."

9. Victim #1, not recognizing those charges, contacted the XXX-XXX-3396 number and was eventually put into contact with a male identified to him as "James Morgan," believed to be an alias. Victim #1 stated that he was in constant contact with "James Morgan" via text and/or phone call on a daily basis, utilizing a third phone number, XXX-XXX-7072. Victim #1 stated that eventually James Morgan stated that he was an official with the Federal Exchange Commission (FEC) and that Victim #1 was under investigation for a myriad of charges, including money laundering. Morgan informed Victim #1 that if he trusted Morgan, Morgan would assist Victim #1 through this investigation.

10. On October 27, 2025, Victim #1 made his first two cash withdrawals in furtherance of this financial fraud scam. He was instructed by Morgan to make two withdrawals from two separate banks totaling $30,000. Victim #1 withdrew $15,000

5

from a bank location in North Kingstown, RI and another $15,000 from a bank location in East Greenwich, RI. Once this was done, he was instructed to take a series of photographs of the money and package them in a box. Victim #1 did so and sent the photographs to Morgan. Below is a screenshot from Victim #1's phone showing the photographs of the money sent to Morgan.



11.     After sending photo confirmation of the money to Morgan, Victim #1 was instructed to drive to a location in Middletown, RI where he was to turn the package over containing the $30,000 to a courier. Victim #1 drove to the location provided to him by Morgan, where he eventually met with whom he described as an Asian male,

approximately 5'10" with brown hair, wearing a baseball cap. There, Victim #1 provided that male with the box containing the money.

12.  On November 4, 2025, Victim #1 was instructed again by Morgan to attempt to withdraw money totaling $30,000. Victim #1 attempted cash withdrawals at bank locations in Coventry, RI, Jamestown, RI, and Narragansett, RI, which were all denied. He was then able to successfully withdraw money from a bank location in Newport, RI for $15,000 and another in Middletown, RI for $9,000. From here, Victim #1 was instructed to go home and wait for more information, which did not come until the next day on November 5, 2025.

13.  On November 5, 2025, Morgan reached out to Victim #1 and provided him with a "code," which was "purple." I know through my training and experience that a "code word" is used in the commission of elder fraud money scams during face-to-face money/gold drops in order to ensure that the victim is providing the currency to the proper person. The scammer informs the victim and the courier of the "code word," and they are both instructed to recite it to one another. After the code was given, Victim #1 sent a photo of the money withdrawn from the day before, which is depicted below:



14.     After receiving photo confirmation of the money, Morgan instructed Victim #1 to drive to a location in Newport, RI to meet with a courier who would be picking up the money. At approximately 4:54PM, Victim #1 gave the $24,000 to an unknown Asian male.

15.     In addition to the money drop that occurred on November 5, 2025, Morgan also instructed Victim #1 to take out $15,000 that day. An attempt was made at a Narragansett bank location (but was unsuccessful.)

16.     Over the next several days, Morgan instructed Victim #1 to take out significantly higher amounts of cash. Specifically, at Morgan's direction, Victim #1 attempted to withdraw $150,000 on November 7, 2025 from a bank location in Middletown, RI and $100,000 from a bank location in Newport, RI. Ultimately, these attempts were unsuccessful.

8

## Narragansett Gold Bar Purchase Attempt

17.     On November 3, 2025, the Newport Police Department received a call from the owner of a store located in Narragansett, RI that deals in gold transactions. The owner of the store reported that a male party (Victim #1) had called his store twice on that day inquiring about buying $200,000 worth of gold bars. The store owner immediately recognized this as suspicious, especially because the same store owner was involved in a prior case heard in Federal Court last year involving the same type of scam. The store owner denied the customer's request. As Newport Police Officers were on the phone with the store owner, Victim #1 entered the store and inquired again about purchasing now $240,000 worth of gold. The store owner again denied his request and directed him to the Newport Police Department.

## Newport Police Department Activity

18.     After several calls with a Newport Police Sergeant familiar with financial fraud cases, Victim #1 came to understand that he was involved in an intricate financial fraud scam case. Victim #1 agreed to cooperate with the Police investigation.

19.     On November 10, 2025, Victim #1 contacted the Newport Police Sergeant and informed him that Morgan had contacted him that morning requesting more money. I was notified by the Newport Police Sergeant and responded to Newport, RI. Once there, we met with Victim #1, who informed us that Morgan had requested that he procure a cashier's check from a bank. Law enforcement, with the assistance of a local Newport bank, facilitated the fictitious printing of a cashier's check in the

9

approximate amount of $69, 721. Morgan instructed Victim #1 to have the check made out to "YDFIL INC." and to tell the bank teller that it was for an investment. After receiving the cashier's check, Morgan instructed Victim #1 to take a series of specific photographs of it, lastly instructing him to place it inside of an envelope and then inside of a "reading magazine," which was to be shipped via UPS to a P.O. Box in Chicago, IL.

20. The magazine was placed inside of a USPS shipping folder and sent to the provided address, without the Cashier's Check inside[1]. It should be noted that during the entire course of events of that day, beginning with Victim #1 entering the bank, until the package was shipped, Morgan remained on an open phone line with Victim #1.

21. On November 13, 2025, Victim #1 notified the Newport Police Sergeant and myself once again and informed us that Morgan had contacted him informing him that the package that was overnighted on Monday had not yet made it to Chicago and that he wanted cash that day. The Newport Police Sergeant and I responded to Victim #1's residence and facilitated the next fictitious money drop.

22. Morgan instructed Victim #1 to go to withdraw $45,000, which would later be picked up by a courier. Again, with the assistance of a local Newport bank, we facilitated the withdrawal of $45,000.[2] Once the money was received, Morgan again requested a series of specific photographs of the money, spread out on a table including

---

[1] HSI-Chicago was notified of the shipment and began an investigation into the destination address.
[2] These transactions bring the total attempted loss amount to Victim #1 to $385,721 and total actual loss amount to $54,000, not including any gold.

10

the withdrawal receipt, then in a box, then in a taped box, and eventually in the trunk of Victim #1's vehicle. Law enforcement facilitated all of these photographs. Eventually Morgan stated that that was confirmation enough and instructed Victim #1 to wait until he heard from Morgan again.

23.     At approximately 3PM, Morgan contacted Victim #1 and informed him that the courier was close and to get in his vehicle. At the time, law enforcement was with Victim #1 at his residence.  Victim #1 was instructed to drive to a location in Newport, RI. Morgan asked Victim #1 what code word to use this day, to which Victim #1 stated "Orange." Newport Police Detectives and Officers were already briefed and in the area. At approximately 3:30PM, Morgan informed Victim #1 that the courier could not find him and that he needed to move to a different location in Newport, RI, which we did. It should be noted that during this entire time, Morgan was on an open phone line with Victim #1.

24.     At approximately 4PM, Morgan informed Victim #1 on the phone that the courier should be there any minute. At around the same time, a gray Toyota Corolla bearing Massachusetts registration 2XFR16 arrived in the parking lot. The vehicle pulled directly next to my unmarked Police vehicle, which had been described to Morgan as the vehicle belonging to Victim #1. The gray Toyota pulled past my vehicle, stopped, and then began backing up to align itself with my driver's side window. At this time, Newport Police Officers identified themselves and effected the arrest of the operator of the Toyota.

25.     The sole male occupant/operator of the vehicle was identified as Samyag Uday DOSHI (YOB 2000). DOSHI became immediately emotional and stated, "Sir, I am just a student." DOSHI was read his Constitutional Rights and asked why he was in Newport. He eventually conceded that he was there to retrieve a package from an elderly gentleman. I asked DOSHI what the code word was that he was given, to which he stated "orange." While DOSHI was being taken into custody, he was clearly on an open phone line with a phone number in the communication application "WhatsApp." I know through my training and experience that couriers involved in financial fraud scams are generally on the phone before, during and after currency pickups with their "bosses," and that these bosses are often located overseas. DOSHI was transported to the Newport Police Department.

26.     The vehicle DOSHI was operating was identified as a "ZipCar" rental, which later investigation showed was paid for by a party named INDIVIDUAL #1. Both INDIVIDUAL #1 and DOSHI share the same address in Dorchester, MA. I also know through my training and experience, especially in elder financial fraud cases, that there is sometimes an "upper-level manager" involved in the scam who will purchase necessary items for couriers to use such as rental vehicles, hotels and airline tickets. The vehicle was towed to the Newport Police Department to be later released back to ZipCar.

### Interview of DOSHI

27. Once back at the Newport Police Department, DOSHI was interviewed by a Newport Police Sergeant and I. DOSHI was re-read his Constitutional Rights, to which he stated he understood and indicated that he wished to speak with us. DOSHI signed a copy of his Constitutional Rights form. DOSHI was also provided with a "consent to search" form for the cellular phone located in his vehicle which he indicated was his. DOSHI voluntarily signed the "consent to search" form and provided the phone's passcode to me. I began speaking with DOSHI, who initially was deceitful in his answers, telling me that this was the first time he had ever done a money pick-up and that he was just a student at a university in Massachusetts. After several minutes of lies and deceitful behavior, I left the room.

28. I did a cursory preview of DOSHI's phone. Inside of the "deleted photos" section, I located several photographs of evidentiary value. There were a multitude of deleted screenshots showing GPS routes, some of which were from November 13, 2025 showing locations in Newport, RI. I know through my training and experience and conversations with other Law Enforcement Officers that in furtherance of these types of scams, scammers and "dispatchers" will instruct couriers to put the location of an anticipated money pick up into their phones' GPS and have them screenshot it to ensure that they are in the location provided to them. Below is a photograph depicting what was found in the phone belonging to DOSHI:



29.     Also found in the deleted photographs section of DOSHI's phone was a video depicting him seated in a vehicle. In the video, DOSHI places his phone in what appears to be the handle above the driver's side door in order to get a "bird's eye view" recording. DOSHI is seen on the recording opening a cardboard box and retrieving what appears to be a large gold bar. I know from my training and experience regarding

14

these types of cases that, after money or gold is picked up by a courier, they are instructed by their "bosses" to record a video of themselves opening the box to show its contents. That video is then sent to the boss for confirmation of pick-up. From there, the couriers are provided a "token." In most cases, the "token" is a photograph of a dollar bill, specifically showing the serial number of the bill. The courier is then provided with the phone number and location of a "token drop," where they are instructed to drive to. Once there, they meet with a person who gives them a dollar bill. If the serial number on that dollar bill matches the one sent to them in a photograph, they hand the currency or gold to that person and receive payment for their role in the scam.

30. After locating the above depicted photos in DOSHI's phone, I continued to speak with him. After being confronted with this new information, he recanted his original story and conceded that he has done at least 4-5 money pick-ups before and has delivered that money to token drops. DOSHI stated that for the November 13, 2025 pick-up, he would have been paid $500. DOSHI stated that he answers to a male party known to him as "Siad (SIYAD)." He believes Siad is in Gujarat, India. After a few more moments of conversation, DOSHI requested the presence of a lawyer, and our conversation was ended.

31. DOSHI was booked and processed by the Newport Police Department and charged with two state counts of obtaining property under false pretenses and two state counts of conspiracy, both felonies.

## HSI-Chicago Involvement

32.  As part of this case, HSI-Chicago was notified of the shipment sent from Newport, RI to Chicago, IL said to contain a cashier's check as instructed by Morgan to Victim #1. On November 13, 2025, that package was scheduled to be delivered to a P.O. Box located inside of a UPS store in Chicago, IL. Agents and Task Force Officers from HSI-Chicago took surveillance positions in the area and awaited the arrival of a courier suspected to pick up the parcel. At approximately 4PM, an Asian male entered the UPS store and went towards the P.O. Box locations, which were being surveilled by HSI Agents. The male party exited the UPS store and sat in his vehicle, which was in direct line of sight to the HSI Agents. The male party opened the parcel which was sent from Newport, RI and began examining the "reading magazine" that the scammers believed contained the check. The Asian male spent a considerable amount of time examining the magazine before he began to leave the area. He was subsequently stopped by HSI Agents and detained for an interview.

33.  Also located with that male party were several other parcels similar to the one sent by Victim #1 bearing the names of suspected victims of this financial fraud scam. A subsequent investigation by HSI-Chicago revealed that the male party, now identified as Ka Hin LAM (YOB 2005) was most likely involved in the same faction of this financial fraud scam as DOSHI. LAM was interviewed and subsequently released. However during his interview, he provided consent to preview his cellular phones. Found inside of the phones was a considerable amount of evidentiary material,

including videos of LAM opening packages containing proceeds from money pick-ups, identical to the one found so far in DOSHI's phone.

## CONCLUSION

34. Based on the aforementioned facts, there is probable cause to believe that DOSHI, LAM, and other known co-conspirators and unknown co-conspirators did commit Conspiracy to Commit Wire Fraud in violation of 18 U.S.C. § 1349 and Wire Fraud in violation of 18 U.S.C. 1343, (together the "Specified Offenses").

## REQUEST FOR SEALING

35. I respectfully request that the Court order that all papers in support of these applications, including the affidavit and search warrants, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

*Jared Johansen*

Jared Johansen
Task Force Officer
Homeland Security Investigations

| | |
|---|---|
| Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1. by: **Telephone** (specify reliable electronic means) **Sworn telephonically and signed electronically** | |
| November 14, 2025 | *Pat CaSull* |
| Date | Judge's Signature |
| **Providence, Rhode Island** | **Patricia A. Sullivan, USMJ** |
| City and State | Printed Name and Title |

18